# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: August 1, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| CHRISTINE DeLOZIER, | * | |
| *parent and next friend of L.T., a minor*, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 15-124V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Ruling Awarding Pain and Suffering |
| AND HUMAN SERVICES, | * | Damages; Hepatitis B Vaccine; Alopecia |
| | * | Areata. |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioner.
Julia Marter Collison, U.S. Department of Justice, Washington, DC, for respondent.

### RULING AWARDING PAIN AND SUFFERING DAMAGES[1]

On February 9, 2015, Christine DeLozier[2] ("petitioner"), as parent and next friend of L.T., a minor, filed a petition for compensation under the National Vaccine Injury Compensation

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] During pendency of this case, petitioner changed her last name from Torres to DeLozier, and therefore the case caption was amended. Order dated Feb. 1, 2019 (ECF No. 58).

Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[3] Petitioner alleged that L.T. suffered from alopecia areata as the result of a hepatitis B vaccination administered on November 6, 2012. Petition at 1 (ECF No. 1). On December 10, 2019, a ruling on entitlement issued, finding petitioner entitled to compensation. Ruling on Entitlement dated Dec. 10, 2019 (ECF No. 66). The Chief Special Master found L.T. was entitled to compensation associated with the first occurrence of alopecia areata, but not for any subsequent occurrence of alopecia areata after August 2015. Id. at 2, 24. A damages decision issued on August 11, 2020, awarding petitioner $50,000.00 in actual pain and suffering. Damages Decision dated Aug. 11, 2020 (ECF No. 75).

Thereafter, petitioner filed a motion for review, which was granted by Senior Judge Mary Ellen Coster Williams, and remanded to the Chief Special Master to determine appropriate compensation for subsequent and future recurrences of L.T.'s alopecia areata. Opinion and Remand Order ("Remand Order") dated Feb. 19, 2021 (ECF No. 92). Specifically, "[t]he Chief Special Master [was] directed to reopen the evidentiary record on remand and permit the parties to submit additional evidence on damages and retain relevant damages experts, such as life care planners, to render opinions on appropriate compensation for subsequent and future recurrences of L.T.'s [alopecia areata]." Order Clarifying Remand Instructions ("Order Clarifying Remand") dated June 24, 2021 (ECF No. 110).

Because the parties have been unsuccessful in resolving damages, a damages hearing was held on June 23, 2022. The only issue that remains in dispute is petitioner's actual and future pain and suffering award.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that in addition to the award of $50,000.00, petitioner is entitled to receive an additional award in the amount of $70,000.00 (to reflect 2015 to present) for actual pain and suffering for a total of $120,000.00, and an award for future pain and suffering in the amount of $10,000.00 per year, reduced to net present value, for petitioner's remaining life expectancy or until the statutory cap is met. The total award for actual and future pain and suffering is capped at the statutory maximum of $250,000.00.[4]

---

[3] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

[4] Based on L.T.'s birth date of June 29, 2009, L.T. is expected to live for approximately 69 additional years based on the data for all females. See Elizabeth Arias & Jiaquan Xu, Nat'l Ctr. for Health Statistics, Ctrs. for Disease Control & Prevention, United States Life Tables, 2019, 70 Nat'l Vital Stat. Reps. 1, 3 tbl.A (2022). Thus, the statutory cap will be reached before the full payments reflecting her remaining life expectancy are reached.

## I. RELEVANT PROCEDURAL HISTORY

After this case was remanded to the Chief Special Master in February 2021, an order clarifying the remand was issued in June 2021. Remand Order; Order Clarifying Remand. Thereafter, the case was reassigned to the undersigned on June 9, 2021. Notice of Reassignment dated June 9, 2021 (ECF No. 109).

The undersigned held status conferences in June 2021, August 2021, October 2021, and December 2021, and during this time, petitioner filed updated medical records, photographs, a sworn declaration, and medical literature, and the parties filed life care plans. Petitioner's Exhibits ("Pet. Exs.") 32-40; Respondent's ("Resp.") Ex. L. In January 2022, respondent filed a consolidated life care plan and petitioner filed an expert report from Dr. David Norris. Resp. Ex. M; Pet. Ex. 42.

On February 14, 2022, petitioner filed a damages memorandum. Pet. Memorandum on Damages ("Pet. Mem."), filed Feb. 14, 2022 (ECF No. 144). Respondent filed his damages brief on March 1, 2022, along with an expert report from Dr. Megha Tollefson. Resp. Damages Brief ("Resp. Br."), filed Mar. 11, 2022 (ECF No. 146); Resp. Ex. N.

A damages hearing was held on June 23, 2022. Thereafter, the parties filed updated life care plans, consistent with the undersigned's bench rulings issued during the June 23, 2022 hearing. Pet. Ex. 47; Resp. Ex. P. In a joint status report, respondent stated that he agrees to reimburse the New York State Medicaid Lien in the amount of $1,953.34. Joint Status Rept., filed July 18, 2022, at 1 (ECF No. 169) (citing Pet. Ex. 46). The parties also agreed that the only remaining item of damages was pain and suffering. Id.

The issue of pain and suffering is now ripe for adjudication.

## II. BACKGROUND

### A. Medical Records

The Ruling on Entitlement set forth a summary of petitioner's medical records until the end of 2018. See Ruling on Entitlement at 2-6. Only those relevant portions since August 2015 will be repeated here.

On August 10, 2015, L.T. returned to Rochester General Hospital for a sore throat. Pet. Ex. 11 at 18-24. L.T. was tested for a sore throat, treated for her sore throat, and discharged. Id. She was seen by Dr. Julia Stein, who noted a medical history of alopecia areata but did not record any other information about alopecia areata at that time. Id.

L.T. visited Rochester General Hospital for a routine child exam on August 19, 2015. Pet. Ex. 10 at 28. L.T.'s weight was noted as being low and weight management was discussed. Id. at 35. Dr. Andrew Sherman did not list any current concerns, active issues, or chronic issues. Id. No notes of alopecia areata were made except in the health history section. Id.

3

The same day, August 19, 2015, L.T. visited Universal Dermatology PLLC, Dr. Elaine Gilmore's practice. Pet. Ex. 9 at 1. Petitioner's reason for bringing L.T. in was for "hair loss that is multifocal and mild in severity," that had manifested two weeks prior. Id. A physical exam revealed some hair loss patches on L.T.'s central forehead and right inferior occipital scalp, along with thin eyebrows and "coin-like eczematous patches" on her arms and left thigh. Id. Dr. Gilmore recommended that her alopecia areata could be treated using topical steroids, and that petitioner should contact the office if symptoms plateaued or worsened despite treatment. Id.

L.T. returned to see Dr. Gilmore on September 25, 2015. Pet. Ex. 9 at 5. Dr. Gilmore noted that L.T.'s alopecia areata was improving with treatment and had improved overall. Id. Dr. Gilmore observed "minimal alopecic patches on the anterior scalp and thin eyebrows throughout." Id. She advised petitioner to reduce the amount of steroid being taken and that L.T. could apply ointment to her face to stimulate eyebrow growth. Id.

L.T. next saw Dr. Gilmore in April 2016. Pet. Ex. 28 at 1. At this time, Dr. Gilmore observed discrete non-scarring patches of hair loss on the "right superior temple and left occipital scalp." Id. Dr. Gilmore discussed with petitioner the natural history of alopecia areata, which was associated with flares and remissions. Id. Dr. Gilmore also noted that L.T.'s hair loss, at that time, was not severe enough to warrant systemic therapy. Id.

In November 2016, L.T. presented to Dr. Gilmore for further evaluation. Pet. Ex. 28 at 2. During the visit, Dr. Gilmore observed alopecia areata on L.T.'s "right superior central forehead, left superior central forehead, and left lateral eyebrow." Id. This distribution of alopecia areata was notably different than what had been reported in August 2015. Compare Pet. Ex. 9 at 3 (showing alopecia areata patches in August 2015 behind the right ear and on the left superior forehead), with Pet. Ex. 28 at 3 (showing alopecia areata patches in November 2016 on the left eyebrow and on two locations on the forehead). Dr. Gilmore discussed new possible therapies for L.T.'s condition, but explained that it would be difficult to predict her future hair growth. Id.

The next month, L.T. went to Rochester Regional Health for a well-child visit. Pet. Ex. 29 at 6. Dr. Sherman observed that L.T. had alopecia areata symptoms, and was also complaining of knee, wrist, and elbow pain at times, consistent with complaints from the previous month. Id.

L.T. went to the doctor again on December 16, 2016 for a well-child visit at Rochester Regional Health. Pet. Ex. 29 at 1. Dr. Sherman recorded that L.T. "[s]till has [a] patch of alopecia behind right ear and near midline of mid occipital area." Id. at 6-7. L.T. was scheduled for another well-child visit the following year and informed Dr. Sherman that she would follow-up on her alopecia areata with a dermatologist and rheumatologist. Id. at 6-8.

Moving forward to 2017, L.T. presented to Rochester Regional in late June 2017 for a cough and sore throat. Pet. Ex. 29 at 17. No notes on alopecia areata or eczema were made other than in the health history section. See id.

4

In August 2017, L.T. visited Rochester Regional for her eight-year well-child visit. Pet. Ex. 29 at 27. L.T. had no current concerns and was "doing well." Id. at 32. Dr. Sherman did not note any alopecia areata in his objective examination of L.T. Id. at 33. L.T. declined immunizations citing her prior medical history of alopecia areata after vaccination. Id.

L.T. returned to Rochester Regional in October 2018 for her nine-year well-child visit. Pet. Ex. 29 at 42. L.T. had no current concerns, was doing well, and had "no current hair changes." Id. at 47-48. Dr. Sherman did not note any alopecia areata flares. Id. at 48.

On July 10, 2019, L.T. saw Dr. Sherman at Rochester Regional seeking advice regarding vaccines and "her patchy hair loss." Pet. Ex. 32 at 17. Dr. Sherman provided guidance for the vaccine and hair concerns and referred L.T. to an allergist. Id. at 18.

On January 20, 2021, L.T. had a follow up telemedicine appointment with Dr. Gilmore to discuss her alopecia areata. Pet. Ex. 33 at 1. Petitioner reported that "for the most part they haven't seen any large flare ups in [L.T.'s] hair loss." Id. Petitioner inquired about different treatments. Id. Dr. Gilmore noted "alopecia areata on [L.T.'s] right superior central forehead, left superior central forehead, and left lateral eyebrow." Id. Under impression, Dr. Gilmore noted "[d]iscrete non-scarring patches of hair loss," and noted L.T.'s alopecia areata was "worsening." Id. L.T. was prescribed a topical ointment. Id.

No additional medical records were filed.

**B.     Hearing Testimony, Affidavits, and Expert Reports**

**1.     Petitioner**

In a sworn declaration executed on November 5, 2021, petitioner "estimate[d] that L.T. has had seven relapses since the original onset of [alopecia areata] in 2012." Pet. Ex. 36 at ¶ 5. Petitioner explained that when L.T. experienced her first relapse, "she developed [] two large, half-dollar sized bald spots on her head," which "eventually filled in." Id. at ¶ 3. Since then, L.T. "periodically gets bald spots and has trended toward a thinner and more receded hairline." Id. at ¶ 4. L.T. also suffers from eczema and joint pain. Id.

At the damages hearing, petitioner testified in further detail about L.T.'s relapses. She explained that during one relapse, L.T. had bald spots in the front of her head, which were very visible and hard to cover up. Transcript ("Tr.") 7. Other times, L.T. would have bald spots on the side of her head that petitioner could cover if L.T. wore her hair a certain way. Id. With each relapse, L.T.'s "entire hairline has receded." Tr. 11. These relapses "lasted quite a long time," at least a few months up to four months before L.T.'s hair started to grow back. Tr. 9-10.

L.T.'s treatment began with "alternating clobetasol, which is a topical steroid, with Protopic, which is an anti-inflammatory cream." Tr. 11. Recently, "Dr. Gilmore[] recommended a topical Retin-A type cream . . . to be used in place of the steroids." Tr. 12. This cream is administered outside of a relapse on the areas of hair loss to stimulate hair growth. Tr. 14-15. However, petitioner stated they have not seen a lot of improvement with this cream. Tr.

5

12-13, 15. When L.T. has a relapse, petitioner still administers a topical steroid to the areas of hair loss. Tr. 13.

L.T. is very self-conscious about her hair and her condition has affected her self-esteem. Tr. 8, 16. Petitioner explained that L.T. thinks "bald is ugly," and lives in fear that she will lose her hair again. Tr. 8. Some people at school have made fun of L.T., calling her "bald" and "ugly." Id. L.T. has tried to completely avoid talking about her condition and finds it very stressful. Id. During periods of baldness, people thought L.T. had cancer and have stared at her, which has made L.T. feel uncomfortable. Tr. 17. Additionally, L.T. is visibly nervous and worried about people noticing her bald spots. Id.

Additionally, L.T. "continues to have a rash on [] the back of her legs" and as a result, L.T. does not like wearing bathing suits or shorts because she does not want people to see her rash. Tr. 18. The hair loss and rashes typically get worse at the same time. Id.

### 2. Dr. David Norris[5]

Dr. Norris is an expert on behalf of petitioner. He is a board-certified dermatologist who works as a dermatologist at the Denver Department of Veteran Affairs Hospital. Pet. Ex. 17 at 1; Tr. 84. He is a member of the National Alopecia Areata Foundation, where he has participated in numerous activities over the past 25 years. Tr. 85. Additionally, he has conducted research on alopecia areata throughout his career. Tr. 86.

Dr. Norris opined that L.T. is "likely to have issues long term with [a]lopecia [a]reata and will likely need some type of treatment throughout her life." Pet. Ex. 42 at 1. He explained that alopecia areata is a chronic disease, and once it is triggered, it "will likely continue lifelong." Id.; Tr. 134. "Given her past history, complete hair loss is a concern for [L.T.] in the future." Pet. Ex. 42 at 2.

Citing Madani and Shapiro,[6] Dr. Norris noted risk factors that clinicians use to determine the severity of a patient's outcome. Tr. 89 (citing Pet. Ex. 21). The authors noted prognosis of alopecia areata "is unpredictable." Pet. Ex. 21 at 9-10. They stated "[i]ndicators of a poor prognosis are atopy,[7] the presence of other immune diseases, family history of [alopecia areata],

---

[5] Petitioner filed two expert reports from Dr. Norris, one on causation (Pet. Ex. 16) and one on damages (Pet. Ex. 42). Damages is the issue most relevant here. A significant portion of Dr. Norris' expert report on damages dealt with appropriate medical treatment. That aspect of his opinion is not discussed in this Ruling.

[6] Shabnam Madani & Jerry Shapiro, Alopecia Areata Update, 42 J. Am. Acad. Dermatology 549 (2000).

[7] Atopy is "a genetic predisposition toward the development of immediate (type I) hypersensitivity reactions against common environmental antigens (atopic allergy)." Atopy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=4738 (last visited July 26, 2022). A clinical manifestation of atopy is atopic dermatitis. Id.

6

young age at onset, nail dystrophy, extensive hair loss, and ophiasis."[8]  Id. at 10; see also Pet. Ex. 16 at 2.  These criteria are also risk factors for the propensity of the disease to recur.  Tr. 132. Dr. Norris opined that L.T. "fits into the phenotype of patients who are going to have severe risk" because L.T. has "most of the criteria predicting severe outcome."  Tr. 89-90.  L.T. has atopy, was young at onset, has extensive hair loss, and has ophiasis.  Tr. 89-90, 132; Pet. Ex. 16 at 2.

Dr. Norris also opined "that the diagnosis of [a]lopecia [a]reata usually has a large psychological impact on children, teenagers, and young adults with this condition."  Pet. Ex. 42 at 1.  He discussed Liu et al.,[9] who provided a systematic review of studies assessing the impact of alopecia areata on health-related quality of life.  Tr. 132-33 (citing Pet. Ex. 20 at 1).  Liu et al. noted that those affected with alopecia areata "often experience marked emotional and psychological distress.  Children and adults often report being harassed, ostracized, stared at, or assumed to be undergoing chemotherapy because of their hair loss."  Pet. Ex. 20 at 1.  "Multiple studies have shown the presence of psychological comorbidities among patients with [alopecia areata], including depression and anxiety."  Id.  Loss of hair has also been associated with loss of self-esteem and lack of confidence.  Id. at 1, 4.  Additionally, pediatric patients have been reported to have lower health-related quality of life.  Id. at 4.  Liu et al. noted "the negative impact of [alopecia areata] on [health-related quality of life] is comparable with that of other common, chronic dermatologic conditions . . . and therefore warrants a similar level of attention."  Id. at 6.  Dr. Norris testified that based on his experience, Lui et al. correctly described issues that occur in alopecia areata patients.  Tr. 133.

Dr. Norris also testified that steroid use, including topical steroids that L.T. uses, cause side effects over time.  Tr. 135.  Some side effects that can result from continuous steroid use over time include "weak bones, peptic ulcer, weight gain, high blood pressure, psychological effects and mood swings[,] and infection."  Id.  Topical steroids "usually . . . limit the spread of that medication to the local area."  Tr. 136.  As of the time of the hearing, L.T. had not used oral steroids.  Id.  Dr. Norris testified that "side effects would be worse with the systemic drug than the topical."  Tr. 147.

### 3.    Dr. Elaine Gilmore[10]

Dr. Gilmore is a board-certified dermatologist and L.T.'s treating physician.  Tr. 102-03.  She is currently the owner and medical director of Universal Dermatology, a private dermatology practice in New York.  Tr. 103.  Prior to that position, she was a full-time tenure-track faculty

---

[8] Ophiasis is "a form of alopecia areata of long duration, involving the temporal and occipital margins of the scalp in a continuous band."  Ophiasis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=35215 (last visited July 26, 2022).

[9] Lucy Y. Liu et al., Health-Related Quality of Life (HRQoL) Among Patients with Alopecia Areata (AA): A Systematic Review, 75 J. Am. Acad. Dermatology 806 (2016).

[10] Dr. Gilmore submitted a letter in this case.  See Pet. Ex. 13.  Dr. Gilmore also testified at the damages hearing.

member in the dermatology department at the University of Rochester, School of Medicine and Dentistry. Tr. 103-04.

At the hearing, Dr. Gilmore briefly discussed her visits with L.T. over the years. Dr. Gilmore first treated L.T. in November or December of 2012. Tr. 105. According to records from a follow up visit in January 2013, L.T. was "started on topical steroid therapy, clobetasol solution, alternating on a weekly basis with Protopic ointment." Id. At the January 2013 visit, Dr. Gilmore noted "widespread, scattered, well demarcated circular, nonscarring patches of alopecia." Id. L.T.'s hair pull test was negative. Id. L.T. was starting to see new hairs on her right temporal scalp. Id. Dermatitis on L.T.'s posterior legs was also noted. Tr. 106.

Dr. Gilmore next saw L.T. in March 2013, and noted there was not a lot of significant improvement since January. Tr. 106. L.T. "continu[ed] to have widespread scattered hair loss, and at that time, it was starting to coalesce into what we call an ophiasis distribution, which is essentially like a band of hair loss along the lower scalp. And she was still having multiple patches of hair loss at the crown." Tr. 107. Dr. Gilmore altered L.T.'s treatment regimen to see if L.T.'s hair regrowth would improve. Id.

On physical examination in June 2013, L.T. "had some patchy nonscarring alopecia" that "was partially ophiasis, so perhaps it was a little bit of improvement." Tr. 107-08. Some new hairs were also noted. Tr. 108. L.T.'s treatment regimen increased in frequency of application. Id.

In August 2015, L.T. experienced another flare and visited Dr. Gilmore complaining of hair loss. Tr. 109. Physical examination revealed "well circumscribed alopecic patches." Id. Topical steroids were prescribed. Id. One month later, in September 2015, L.T. had improvement on the scalp. Tr. 110. "At that time, her alopecia patches were rated as minimal on the anterior scalp" and "her eyebrows were thin throughout." Id. Dr. Gilmore decreased L.T.'s topical steroid use by supplementing with Protopic ointment. Id.

Dr. Gilmore next saw L.T. in April 2016. Tr. 110-11. Dr. Gilmore "noticed several discrete patches of alopecia on the right scalp as well as on the parietal scalp, measuring multiple centimeters in diameter." Tr. 111. L.T.'s "hair loss . . . was pretty confined to these discrete patches." Id. Dr. Gilmore discussed the chronic nature of L.T.'s condition and treatment options with L.T. and petitioner. Id. In November 2016, at a follow up visit, Dr. Gilmore noted L.T. "[c]ontinued to have flares and areas of involvement," including "discrete nonscarring patches of hair loss." Tr. 112.

In January 2021, L.T. returned to see Dr. Gilmore via telemedicine. Tr. 113. "There were some small flares that had occurred during the interim period, but for the most part, [there] [were not] any large significant flares that would have required an office visit." Id.

Dr. Gilmore opined that L.T. "undoubtedly" suffers from a chronic case of alopecia areata and L.T. is likely to have periodic flares throughout her life. Tr. 114-15. She testified that "over the past decade, [L.T.] has had significant periods of time with flares of her alopecia areata," which is "very unpredictable." Tr. 115. Examining the number and extent of flares that

L.T. has displayed over the past decade, Dr. Gilmore found it "highly unlikely that [L.T.] is going to go decades without having involvement." Id.

She noted "published studies have shown that younger age of onset may be associated with a poorer prognosis." Pet. Ex. 13 at 1. Further, Dr. Gilmore opined that there is a psychological component to alopecia areata, especially in females and children. Tr. 115-17.

Additionally, Dr. Gilmore, examining photographs of L.T., opined L.T. has had significant hair loss. Tr. 114. Dr. Gilmore testified that a severe case of alopecia areata does not necessarily mean at least 50% hair loss. Tr. 125-26. "[E]very patient is different. . . . Forty percent hair loss is pretty bad, and certainly if a patient is having significant psychological effects, if they're not able to function because of what they're experiencing . . . ." Tr. 126.

### 4. Dr. Megha Tollefson[11]

Dr. Tollefson is an expert retained on behalf of respondent. She is a board-certified pediatric dermatologist at the Mayo Clinic in Rochester, Minnesota. Resp. Ex. N at 1. She did not testify at the damages hearing but submitted expert reports.

Dr. Tollefson opined L.T. "has alopecia areata that is at high risk for remaining a chronic disease." Resp. Ex. A at 4. Based on L.T.'s medical records, Dr. Tollefson found L.T. "has experienced intermittent flares of her alopecia areata, with good results and improvement with topical medications." Resp. Ex. N at 1. She agreed that L.T. "may experience intermittent flares of her [alopecia areata] for years." Id. at 2. "As indicated by Dr. Gilmore, if [L.T.] continues to have flares, she is much more likely to experience flares with circular patches of hair loss as has been the case for her previously, rather than more generalized complete hair loss." Id. Dr. Tollefson opined "it is far more likely that [L.T.'s] [alopecia areata] will continue to respond to the treatments already prescribed by Dr. Gilmore and other more standard medications such as intralesional steroid injections, than it is that she would ever develop the severe refractory disease." Id. Additionally, Dr. Tollefson noted there is a potential impact on L.T.'s quality of life and/or mental health due to her alopecia areata. Id. at 3.

## III. PARTIES' CONTENTIONS

### A. Petitioner's Contentions

Petitioner requests an actual pain and suffering award of $100,000.00 for year three (2015) to the present, which is a span of approximately seven years. Pet. Mem. at 10. Petitioner also requests an award of $10,000.00 per year in future pain and suffering, reduced to net present value. Id. The statutory cap of $250,000.00 would thus be reached in 2032. Id.

---

[11] Dr. Tollefson submitted two expert reports, one on causation (Resp. Ex. A) and one on damages (Resp. Ex. N). Damages is the issue most relevant here. A portion of Dr. Tollefson's expert report on damages rebutted some of Dr. Norris' opinions regarding appropriate medical treatment. That portion of her opinion is not included in this Ruling.

9

Petitioner argues this award "would provide L.T. with an emotional distress award through her schooling years, including college and her entry into the work force." Pet. Mem. at 10. L.T. has continued to suffer relapses of her alopecia areata. Id. Additionally, her treating physician, Dr. Gilmore, has described L.T.'s alopecia areata as "worsening." Id. Petitioner also notes L.T. has become more aware of her injury over the years. Id.

### B.   Respondent's Contentions

Respondent acknowledges that several alopecia cases have been settled, nearly all involving total and permanent hair loss, and none by proffer. Resp. Br. at 21. Additionally, "[t]here are no reasoned decisions awarding damages in an alopecia case." Id.

Using the same three-factor assessment used by the Chief Special Master in the first damages decision, which looks at (1) severity of the injury, (2) awareness of the injury, and (3) duration of the suffering, respondent argues petitioner should be awarded an additional $50,000.00 in pain and suffering, totaling $100,000.00 in actual and future pain and suffering. Resp. Br. at 21-23 (citing Collado v. Sec'y of Health & Hum. Servs., No. 17-0225V, 2018 WL 3433352, at *6-8 (Fed. Cl. Spec. Mstr. June 6, 2018)).

With regard to the element of awareness, respondent agrees that L.T. "is certainly able to understand her [alopecia areata]." Id.

Regarding severity, respondent contends that L.T. has experienced one additional flare since 2015, lasting from August 2015 to November 2016.[12] Resp. Br. at 23. "Since then, the medical records show that [L.T.'s] condition has been stable and limited. Indeed, at the January 2021 visit, Dr. Gilmore noted that [L.T.] had not been seen for more than four years, and [L.T.'s] mother confirmed that there had not been any large flare-ups during that time." Id.

Lastly, with regard to duration, respondent agrees L.T. "may experience intermittent flares of her [alopecia areata] for years." Resp. Br. at 23. Respondent's expert, Dr. Tollefson, opined L.T. is "much more likely to experience flares with circular patches of hair loss as has been the case for her previously, rather than more generalized complete hair loss." Id. (quoting Resp. Ex. N at 2). Based on this opinion, respondent contends L.T.'s alopecia areata "will remain stable, as it has since 2016." Id.

## IV.   LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

---

[12] Respondent's brief was submitted before the damages hearing, and thus, may not reflect some of the testimony.

10

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

**V.    DISCUSSION**

    **A.    Actual Pain and Suffering**

When performing this analysis, the undersigned reviews the record as a whole, including the medical records, affidavits, testimony, and expert opinions. The undersigned bases her decision as to the appropriate amount of damages on the particular facts and circumstances of this specific case.

In this case, awareness of injury is not in dispute. Even though L.T. was young when her injury occurred, the testimony by her mother, petitioner, established that L.T. was and continues to be aware of her condition.

With regard to severity, petitioner testified that L.T. developed bald spots, thinner hair, and a receded hairline with each relapse. According to Dr. Norris, indicators of a poor prognosis include atopy, young onset, extensive hair loss, and ophiasis, all of which L.T. has experienced. Dr. Gilmore agreed with Dr. Norris that a "younger age of onset may be associated with a poorer prognosis." Pet. Ex. 13 at 1. Examining photographs of L.T., Dr. Gilmore opined L.T. has had significant hair loss.

On the other hand, Dr. Tollefson, respondent's expert, opined that it is less likely "that [L.T.] would ever develop the severe refractory disease" or a "more generalized complete hair loss." Resp. Ex. N at 2. However, alopecia areata is unpredictable and chronic. Dr. Gilmore testified that a severe case of alopecia areata does not necessarily mean at least 50% hair loss. Tr. 125-26. Dr. Gilmore noted that to determine a severe case, one must also look at psychological effects of the hair loss.

The experts, Dr. Norris and Dr. Tollefson, and petitioner's treating dermatologist, Dr. Gilmore, agree that there are psychological issues patients with alopecia areata are at risk of developing that may affect their quality of life. Lui et al. noted "[c]hildren and adults often report being harassed, ostracized, stared at, or assumed to be undergoing chemotherapy because of their hair loss." Pet. Ex. 20 at 1. Lui et al. also reported depression, anxiety, loss of self-esteem, and lack of confidence in those suffering from alopecia areata, and Dr. Norris agreed. Additionally, Lui et al. and Dr. Gilmore noted this psychological component has been found to especially affect females and children.

Petitioner testified that L.T.'s alopecia areata has already resulted in psychological issues in L.T., affecting her self-esteem and confidence. L.T. has been bullied in school and people have stared at her and thought she had cancer. Petitioner also explained that L.T. fears and worries about relapses and people noticing her bald spots.

As for duration, L.T. has experienced multiple flares since her initial onset. Petitioner testified that based on her review of photographs, L.T. has had approximately seven flares. The experts, Dr. Norris and Dr. Tollefson, and petitioner's treating dermatologist, Dr. Gilmore, agree L.T. will continue to experience flares throughout her life. Dr. Norris explained that alopecia areata "will likely continue lifelong" after being triggered. Pet. Ex. 42 at 1. Dr. Tollefson agreed that L.T. "may experience intermittent flares of her [alopecia areata] for years." Resp. Ex. N at 2. Dr. Gilmore testified that she "would expect unfortunately [L.T.] to have flares periodically going forward." Tr. 115. Given the number and extent of flares that L.T. has displayed over the past decade, Dr. Gilmore found it "highly unlikely that [L.T.] is going to go decades without having involvement." Id.

Based on a review of the entire record and consideration of the facts and circumstances presented here, the undersigned finds an award of $10,000.00 per year, from 2015 to present, totaling seven years, to be an appropriate and reasonable award for actual pain and suffering. Thus, the undersigned awards $70,000.00 in compensation for L.T.'s actual pain and suffering.

### B. Future Pain and Suffering

The undersigned finds an award of future pain and suffering reasonable and appropriate. As respondent noted, "[e]veryone agrees that [L.T.] may experience intermittent flares of her [alopecia areata] for years." Resp. Br. at 23. The experts agree, and the medical literature substantiates, that alopecia areata is an unpredictable, chronic disease that can result in intermittent flares for years.

Dr. Gilmore, for example, opined that L.T. "undoubtedly" suffers from a chronic case of alopecia areata. Tr. 115. She also opined that L.T. is likely to have periodic flares throughout her life. As L.T.'s treating dermatologist, Dr. Gilmore discussed with petitioner the natural history of alopecia areata, which is "very unpredictable" and can be associated with flares and remissions. Pet. Ex. 28 at 1; Tr. 115. In November 2016, Dr. Gilmore noted L.T. "[c]ontinued to have flares and areas of involvement," including "discrete nonscarring patches of hair loss." Tr. 112. At L.T.'s most recent visit to Dr. Gilmore in January 2021, Dr. Gilmore noted L.T.'s alopecia areata was "worsening." Pet. Ex. 33 at 1. At the hearing, Dr. Gilmore opined that L.T. has had significant hair loss. She found it "highly unlikely that [L.T.] is going to go decades without having involvement." Tr. 114-15. She also noted "published studies have shown that younger age of onset may be associated with a poorer prognosis." Pet. Ex. 13 at 1.

Petitioner's expert, Dr. Norris, agreed that alopecia areata is a chronic disease that continues through life. He opined L.T. is "likely to have issues long term with [a]lopecia [a]reata and will likely need some type of treatment throughout her life." Pet. Ex. 42 at 1. "Given L.T.'s history, Dr. Norris opined that complete hair loss is a concern for [L.T.] in the future." Id. at 2. Dr. Norris listed risk factors for a poor prognosis and propensity of the disease to recur, and noted L.T. has most of the criteria, including atopy, young onset, extensive hair loss, and ophiasis.

Although Dr. Tollefson, respondent's expert, did not agree that L.T. "would ever develop the severe refractory disease" or complete hair loss, she agreed that L.T. "has alopecia areata that is at high risk for remaining a chronic disease" and L.T. "may experience intermittent flares of her [alopecia areata] for years." Resp. Ex. A at 4; Resp. Ex. N at 2.

Based on the L.T.'s medical records, and the evaluation and opinions of Drs. Gilmore, Norris, and Tollefson, the undersigned finds an award of future pain and suffering is appropriate and reasonable given the chronic nature of alopecia areata and its known psychological sequela. The undersigned finds an award of $10,000.00 per year for her life expectancy, reduced to net present value, is appropriate. This amount shall be capped so that L.T.'s total award for pain and suffering does not exceed the statutory cap of $250,000.00.[13]

---

[13] Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).

## VI. CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to her knowledge and experience adjudicating vaccine injury cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded (1) $50,000.00, as reflected in the prior damages decision for actual (or past) pain and suffering for L.T.'s initial occurrence of alopecia areata up to August 2015; (2) $70,000.00 in compensation for actual (or past) pain and suffering for August 2015 to present; and (3) $10,000.00 per year reduced to net present value, for the rest of L.T.'s life expectancy or until the statutory cap is met, for future pain and suffering.

**Therefore, petitioner is awarded $120,000.00 for actual pain and suffering and $10,000.00 per year, reduced to net present value, for future pain and suffering, for the rest of her life or until the statutory cap of $250,000.00 is met.**

**The parties are to file a joint status report by <u>Wednesday, August 31, 2022</u>, (1) converting the undersigned's award of future pain and suffering to its net present value, and (2) providing a statement of all damages in the manner that the parties agree as the parties proposed in their July 18, 2022 joint status report. If the parties are unable to agree on the amount of the net present value of the future award, the undersigned will use a one percent net discount rate for future payments.[14]**

**Thereafter, a damages decision will issue.**

**IT IS SO ORDERED.**

s/Nora Beth Dorsey
Nora Beth Dorsey
Special Master

---

[14] See <u>Dillenbeck v. Sec'y Health & Hum. Servs.</u>, No. 17-428V, 2019 WL 4072069, at *15 (Fed. Cl. Spec. Mstr. July 29, 2019) (applying a one percent net discount rate for the first fifteen years, followed by a two percent net discount rate for the remaining years), <u>aff'd in part</u>, 147 Fed. Cl. 131 (2020); <u>Curri v. Sec'y of Health & Hum. Servs.</u>, No. 17-432V, 2018 WL 6273562, at *5 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (same); <u>Petronelli v. Sec'y Health & Hum. Servs.</u>, No. 12-285V, 2016 WL 3252082, at *5-6 (Fed. Cl. Spec. Mstr. May 12, 2016) (analyzing the appropriateness of a one percent discount for future damages).